UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DESMOND THORNTON,

    Plaintiff,

v.

CASE NO: 8:09-cv-41-T-27EAJ

CITY OF TAMPA, FLORIDA; and
KATHLEEN ATILES, in her individual
capacity as an officer with the Tampa
Police Department,

    Defendants.

_____/

**PLAINTIFF'S RESPONSE IN OPPOSITION TO "DEFENDANT, CITY OF TAMPA'S MOTION FOR SUMMARY JUDGMENT" (Dkt. 14)**

Plaintiff, Desmond Thornton, through his undersigned counsel, hereby responds in opposition to the motion for summary judgment described above. Although styled as a motion on behalf of defendant City of Tampa only, the body of the motion reflects defendant Kathleen Atiles' intention to move for summary judgment as well. Plaintiff will proceed accordingly.

For the following reasons, the motions for summary judgment filed by both defendants should be denied.

I.    *Procedural History*

Plaintiff initially brought his claim in state court. (Dkt. 2). Because she was named in a federal claim, defendant Atiles removed the case to this forum. (Dkt. 1). Defendants City of Tampa and Atiles then moved to dismiss (Dkt. 3). In response, plaintiff filed his First Amended Complaint (Dkt. 4), the operative complaint. This Court then denied defendants' joint motion to dismiss as moot. (Dkt. 7). The original complaint was never dismissed, as defendants now

contend. (Dkt. 14 at 1).

Count One of the First Amended Complaint asserts a supplemental state common law claim of false arrest and false imprisonment. As required by § 768.28, *Fla. Stat.*, plaintiff named defendant Atiles' governmental employer, the City of Tampa. (Dkt. 4 at 5). Count Two alleges a Fourth Amendment claim against defendant Atiles, in her individual capacity, pursuant to 42 U.S.C. § 1983. (Dkt. 4 at 5).

## FACTS

II.   *Admitted Facts*

In their joint answer (Dkt. 8), the defendants admitted the following facts appearing in the First Amended Complaint.

On the day of the drug transaction that led to plaintiff's arrest, defendant Atiles was a detective assigned to the anti-narcotics squad of the Tampa Police Department. Answer (Dkt. 8) at ¶ 7. Working in an undercover capacity, Atiles engaged a juvenile in a conversation about purchasing cocaine base for herself. *Id.* at ¶ 8. The juvenile identified his criminal partner, another man, as the seller for the cocaine base. *Id* at ¶ 9. The juvenile identified his partner as "Little Jit." *Id.* This man has not been accurately identified to date. *Id.*

Atiles approached the juvenile's partner with the intention of purchasing base cocaine. *Id.* at ¶ 10. Atiles gave the man a marked $20.00 bill, and then man handed Atiles an item that later tested positive for cocaine base. *Id.* Atiles captured her encounter with the man on videotape with accompanying audio. *Id.* at ¶ 11. The videotape depicts Atiles in civilian clothes, driving an unmarked automobile. *Id.* at ¶ 12. The camera appears to be located near the front passenger seat, pointed at an upward angle toward the driver's window. *Id.* at ¶ 13.

2

The videotape depicts Atiles driving for a few moments. *Id.* at ¶ 14. Atiles then states that she sees the "guy on Grace," referring to Grace Street. *Id.* The videotape depicts Atiles' vehicle coming to a stop. *Id.* at ¶ 15. Atiles then asked, "What's up, G?" *Id.* The videotape then reveals an African-American man in the area of Atiles' open window. *Id.* at ¶ 16. The man does not identify himself as "Little Jit," "G," or by any other name. *Id.* at ¶ 17. The videotape, however, clearly captures the image of his face for several seconds. *Id.*

The videotape then depicts the man placing a small item or items in the palm of Atiles' hand, and Atiles giving the man an item resembling currency. *Id.* at ¶ 19. The videotape then shows Atiles departing in her vehicle. *Id.*¶ at 20. While driving, she described the man's clothing and hair, and estimated his age as "30-35, somewhere in there." *Id.* Atiles sought an arrest warrant for Desmond Thornton on November 10, 2004, and Thornton surrendered in court three days before Christmas, on December 22, 2004. *Id* at ¶ 23. After several mandatory court appearances, and facing charges that exposed Thornton to a mandatory prison sentence, the prosecutor filed a *nolle prosse* on May 10, 2005. *Id.* at ¶ 27.

Additionally, in her December 1, 2009 affidavit, Atiles admits that Thornton is not the man who is depicted in the video. Dkt. 15, ¶ 38. Atiles met Thornton during this litigation and she admits that she does not know him and does not recall having any prior contact with him. *Id.*, ¶ 37.

III. *Desmond Thornton's Deposition Testimony* (Dkt. 17)

In 2004, Thornton was 21 years old, and in June 2004 he was employed Monday through Friday by Super Transportation. Thornton Deposition, p. 6-8. He learned that there was a warrant for his arrest when his mother called him, explaining that her neighbors told her that

3

detectives were in the neighborhood showing them Thornton's photograph. *Id.* at 9. Thornton contacted an attorney, who then learned that there was an arrest warrant for selling cocaine. *Id.* at 12. Thornton appeared before a state court judge, who instructed him to surrender at the Hillsborough County Jail. *Id.* He was required to attend court four more times. *Id.* at 16. He was employed at the time, and was not paid for missing work. *Id.* at 17-18.

While the criminal charges were pending, Thornton watched the videotape of the transaction two or three times. *Id.* at 19. Thornton's attorney had received the videotape and reports in the criminal discovery. *Id.* at 18. The suspect in the video was short, with little "twisties" in his hair; at the time, Thornton's hair was past his shoulders. *Id.* at 21-22. He wore his hair in dreadlocks. *Id.* at 22. His last haircut before the summer of 2004 was 3 ½ years earlier. *Id.* at 22.

When he appeared in court the final time, he learned that the criminal case had been dismissed. *Id.* at 28. He later had his record expunged. *Id.* at 28-29.

Thornton spent approximately five hours in the Hillsborough County Jail. *Id.* at 36.

IV.   *Defendant Atiles' Deposition Testimony* (Dkt. 18)

Kathleen Atiles is a detective with the Tampa Police Department. Atiles' Deposition, p. 3. In 2004, before becoming a detective, she was assigned as an officer in the "Quad Squad," responsible for enforcing drug laws. *Id.* at 4. Between June 5, 2004 and July 22, 2004, Atiles participated in an operation resulting in 40-50 arrests for street level drug sales. *Id.* at 50-51. This was the number of transactions in which Atiles, acting as an undercover buyer, personally performed. *Id.* at 51. Although the relevant reports are somewhat unclear, it is apparent that the drug transaction pertinent to this case occurred on June 5, 2004, and that an arrest of a young

4

man who initially arranged the transaction, Antonio Blanco, occurred on July 22, 2004. *Id.* at 46-47. (At another portion of the report, an "offense date" of July 22, 2004 appears. *Id.* at 52.)

Atiles "barely" recalls the investigation that led to the arrest of Thornton. *Id.* at 7. Her recollection of the investigation and arrest is based on reading her report. *Id.* at 7. Her recollection of the events was refreshed by reviewing the report. *Id.* at 9. Atiles reviewed the videotape that accompanied the police report. *Id.* at 10.

As a member of the Quad Squad, Atiles regularly performed the undercover role of a drug buyer. *Id.* She often did so by driving an unmarked vehicle that was outfitted with a camera and recording device. *Id.* at 11. She regularly initiated drug purchases and recorded the transactions. *Id.* In most cases, while in her vehicle she was flagged down by street drug sellers. *Id.* at 13.

Atiles testified that, according to her report, the person who handed her currency was Thornton. *Id.* at 22 & Depo. Ex. 2. (According to Deposition Exhibit 2, this was a black male "later known to me as THORNTON." Depo. Ex. 2, p. 3.) Having viewed the video, this is the person, depicted on the video, to whom Atiles gave money and from whom Atiles received narcotics. *Id.* at 23. The second person, that is, the person whom Atiles identified in her report as Thornton, accepted a $20.00 bill from Atiles, who noted the bill's serial number on her report. *Id.* at 24.

According to Atiles' report, another officer responded to the area soon after the transaction and identified Antonio Blanco, whom he knew from previous contract. *Id.* at 31 & Depo. Ex. 2, p. 4. Then, according to Atiles' report, another officer, Neal, responded to the area and "located and identified Thornton." *Id.* & Depo. Ex. 2, p. 4. Atiles, however, does not independently recollect, apart from the language of her report, that Neal identified Thornton or

5

how Neal made that identification. *Id.* at 31.

Atiles then testified, again according to her report, that Blanco's and Thornton's "pictures were pulled and I identified them." *Id.* at 31 - 32 & Depo. Ex. 2, p. 4. Atiles does not remember looking at pictures and identifying the two men. *Id.* at 32. She does not recall viewing a picture of a person later known to her as Thornton, or looking at a picture of someone and concluding that he was the man who handed her the $20.00.[1] *Id.* at 32.

Atiles recalls that pictures of Blanco and Thornton "were pulled," and admits that her report states, "I identified them." *Id.* at 33. Officer Detrio told her that the person in one picture was Blanco, that another officer [Neal] told her that the person in the other picture was Thornton, and because Atiles was familiar with neither person she assumed that the officers knew the men. *Id.* at 34. Again, Atiles testified that "'their pictures were pulled and *I identified them as the ones that were involved in this particular transaction.*'" *Id.*, quoting report, Ex. 2, p. 47. As Atiles later reiterated,

> Q: Do you recall what you meant by the term "identified them"? What do you mean by that?
> A: I identified them.
> Q: As the two men that you encountered?
> A: That were involved in this transaction, yes.

*Id.* at 37. Atiles confirmed that it was the person identified as Thornton whose image was captured on 8 mm. videotape. *Id.* at 39.

V.   *Atiles' Report*

According to Atiles' written report, Exhibit 2 to her deposition transcript (filed on today's

---

[1] Actually, the question should have referred to the person handing Atiles the drugs, and receiving money from her in return.

6

date), she provided the following information.

First, according to the report, the offense occurred at Grace Street and Lois Avenue. Atiles' Depo. Ex. 2, p.2. According to her report, the "black male later known to be as THORNTON" was on a bike "wearing a white t-shirt, dark jeans w/sports logos/patches on the thigh area, dreads, and white sneakers . . . ." *Id.*, p.3.

VI.   *The Video*

According to the video, which plaintiff moves to file on today's date, Atiles appears driving her unmarked car. She announces that she sees a "guy on Grace." After receiving cocaine in exchange for currency with an African-American male whose face appears in the video, Atiles pulls away and describes the man to other officers. She describes a man on a bike wearing a white t-shirt, dark blue jeans, and white shoes, with his hair in dreads.[2]

---

[2] It is abundantly clear, then, that the videotape supplied by the State Attorney's Office in criminal discovery, and reviewed by Thornton and Atiles, is the videotape that corresponds with Atiles' police report. The written description of the man later identified as Thornton in Atiles' report is identical to the verbal description captured in the audio portion of the videotape. This fact is significant because, in ¶ 22 of Atiles' December 1, 2009 affidavit (Dkt. 15), she attests that, "I do not know, and I have no way of verifying, if the videotape that I received from the Plaintiff and reviewed is associated with the events memorialized in Agency Report number 2004-296978." (Dkt. 15 at 4). This sworn testimony by an experienced detective is contradicted by the fact that her written report and her comments on the video refer to the same physical location and provide, almost verbatim, an identical description of the suspect.

Similarly, Atiles claims in her affidavit that, when she received notice of this lawsuit, she was unable to obtain a copy of her report because Thornton had his report expunged. Affidavit, (Dkt. 15), at ¶¶ 13-14. (Thornton did so to mitigate his damages.) As a result, Atiles claims, she had to rely on a copy of the report provided in discovery by plaintiff.

However, Ex. 1 to Atiles' deposition is a copy of her report that was printed on November 21, 2008, or nine days after Thornton filed suit. Thornton, of course, could not have obtained this version of the report, which was in fact provided by the defense in discovery. (Thornton, as Atiles attests, did provide reports and the videotape to the defense in discovery, but that was on January 9, 2009.) Thus, Atiles' report, though expunged, *was* available to her on November 21, 2008 (despite being expunged), and, because the report expressly refers to the 8 mm. videotape, it can reasonably be inferred that the original videotape was available as well.

VII.    *Atiles' Criminal Report Affidavit and Court Documents*

Although Atiles' police report is not sworn, her criminal report affidavit was signed under oath.

According to her affidavit, at page 2, the following text appears, following the standard, pre-printed language, namely, "State facts to establish probable cause that a crime was committed by the defendant":

> On the listed date [June 5, 2004] the defendant sold for $20.00 1 piece of crack cocaine to officer Atiles working in an undercover capacity. The cocaine tested positive by [officer] Detrio. The sale occurred within 1000' of Jefferson High School. Distance was measured by ofc. J. Huston using TPD laser #0X00g106 distance of 667.5 feet.
>
> Affiant (sic) positively identified by affiant.
>
> Arrested by [remainder blank].

Ex. 1, p. 2. Officer Atiles' signature then appears below the following language: "I swear that the above statements are correct to the best of my knowledge. For notices to appear, I also certify that a complete list of witnesses and evidence known to me is attached." *Id.* The affidavit then bears the signature of a sergeant, whose name is illegible, who indicates that Atiles' attestation was "sworn to and subscribed before me this 22nd day of July, 2004." *Id.* The first page of Atiles' criminal report affidavit bears a handwritten date of November 10, 2004. *Id.* at 1.

A judge signed a warrant for Thornton's arrest on the same date, November 10, 2004. Ex. 2. Another criminal report affidavit, dated December 22, 2004, reveals that Thornton was arrested on that date pursuant to a warrant. Ex. 3. A docket sheet reveals that the criminal charges were dismissed on May 9, 2005. Ex. 4. Finally, a booking photograph reveals Thornton's physical appearance on December 22, 2004. Ex. 5.

VIII.   *Summary of Facts*

Plaintiff summarizes the material facts as follows. Atiles signed a sworn probable cause affidavit, asserting probable cause for plaintiff's arrest, on July 22, 2004. Her sworn basis for probable cause related to a videotaped and audiotaped drug transaction that occurred on June 5, 2004. The young African-American male whose image was captured in the videotape is not the plaintiff, Desmond Thornton. The videotape filed on today's date is the videotape that corresponds to Atiles' report and affidavit asserting probable cause for Thornton's arrest.

A fellow police officer provided Atiles a photograph and a corresponding name, Desmond Thornton, according to Atiles. Atiles did not know the man, either by name or appearance. Viewing this picture, Atiles identified the person in the picture as the person who "w[as] involved in this transaction." She did so despite having the actual suspect's image on videotape. Again, defendants admit that the man in the video is not plaintiff.

After Atiles submitted her affidavit asserting probable cause for Thornton's arrest, almost four months later a judge issued a warrant for his arrest. The judge's warrant and the front page of the probable cause affidavit bear the same date, November 10, 2004. The only factual basis on which the judge relied was Atiles' criminal report affidavit of July 22, 2004. Atiles testified that she did not write any of the text appearing above her attestation. Atiles' affidavit, on the critical issue of identification, states only that "Affiant (sic) positively identified by affiant." Ex. 1. Atiles believes that it is unlikely that she requested the judge to issue a warrant. Dkt. 15, ¶¶ 34-36. Thornton was arrested - by surrendering to the court after becoming aware of the existence of the warrant - on December 22, 2004. The prosecution *nolle prossed* the felony charges on May 9, 2005.

## MEMORANDUM OF LAW

A.   *Summary Judgment Standard*

9

In *Davis v. Williams*, 451 F.3d 750 (11th Cir. 2006), the Eleventh Circuit held,

> At the summary judgment stage, courts view the totality of the circumstances in the light most favorable to the nonmoving party. *See Skrtich v. Thornton*, 280 F.3d 1295, 1299 (11th Cir. 2002); *Evans v. Stephens*, 407 F.3d 1272, 1277 (11th Cir. 2005). That is, courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*." *Evans*, 407 F.3d at 1278. Even though the "facts," as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case," *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000), our analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the plaintiff. *Skrtich*, 280 F.3d at 1299.

*Id.* at 762-63 (emphasis in original).

B.  *The Fourth Amendment Claim Against Atiles*

According to *Rankin v. Evans*, 133 F.3d 1425 (11th Cir. 1998), the standard for determining probable cause is the same under federal and Florida law. *Id.* at 1433. Yet, the *Rankin* court cautions that the probable cause analysis differs in one important respect, and that is the question of which party bears the burden of proof. *Id.* at 1436. Unlike the burden in a constitutional claim, Florida law places the burden upon the defendant of proving the existence of probable cause. *Id.*

Reaffirming that the standard is the same under the Fourth Amendment and state law, the *Rankin* court held that, for probable cause to exist, "'an arrest [must] be objectively reasonable under the totality of the circumstances.'" *Id.* at 1435 (quotation omitted; bracket in original). In addition, *"An arresting officer is required to conduct a reasonable investigation to establish probable cause."* *Id.* (emphasis added). Quoting Florida law, the *Rankin* court explained, "'Where it would appear to a 'cautious man' that further investigation is justified before initiating a proceeding, liability may attach for failure to do so, especially where the information

10

is readily obtained, or where the accused points out the sources of the information.'" *Id.* at 1435-36, *quoting Harris v. Lewis State Bank*, 482 So.2d 1378, 1382 (Fla. 1st DCA 1986).

Atiles has raised the affirmative defense of qualified immunity. Again, according to the *Davis* court,

> Qualified immunity is a two-part inquiry set forth in *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First we ask, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* If, assuming the plaintiff's allegations were true, no such right would have been violated, the analysis is complete. However, if a constitutional violation can be made out on the plaintiff's facts, we then must determine "whether, at the time of the incident, every objectively reasonable police officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens-Clark County*, 378 F.3d 1274, 1278-79 (11th Cir. 2004)(citing *Saucier*, 533 U.S. at 201-02). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Hope v. Pelzer*, 534 U.S. 730, 739 (2002)(citation omitted). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances . . . . Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* at 741. In the context of a claim for false arrest, an officer is entitled to qualified immunity where that officer had "arguable probable cause," that is, where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest" the plaintiff. *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004)(quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)).
> To determine whether arguable probable cause exists, courts must look to the totality of the circumstances.

*Id.* at 762-63.

According to the Eleventh Circuit's opinion in *Williamson v. Mills*, 65 F.3d 155 (11th Cir. 1995),

> The Fourth Amendment permits warrantless arrests if made with

11

> probable cause. "A law enforcement officer has probable cause to arrest a suspect if the facts and circumstances within the officer's knowledge, *of which he or she has reasonably trustworthy information*, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."

*Id.* at 158 (citations and quotations omitted; emphasis added). In assessing the qualified immunity defense, courts must determine whether arguable probable cause existed, that is, whether "if, under all of the facts and circumstances, an officer reasonably could - not necessarily would - have believed that probable cause was present." *Crosby v. Monroe County*, 394 F.3d 1328, 1332-33 (11th Cir. 2004).

In *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004), the Eleventh Circuit reversed a judgment granting motion for summary judgment to an officer on his qualified immunity affirmative defense in a Fourth Amendment false arrest and malicious prosecution case. *Id.* at 1234. According to *Kingsland*, "'[A qualified immunity analysis] must charge [the officer] with possession of all the information reasonably discoverable by an officer acting reasonably under the circumstances.'" *Id.* at 1228 (quotation omitted). Similarly, "'[A] police officer may not close his or her eyes to facts that would help clarify the circumstances of an arrest.'" *Id.* (quotation omitted). Similarly, the *Kingsland* court held that "an officer may not choose to ignore information that has been offered to him or her," nor "may the officer . . .elect not to obtain easily discoverable facts." *Id.* at 1229. The *Kingsland* court cited Fourth Circuit case law approvingly, reasoning that, when there is no exigency preventing it, an officer cannot fail "to do what any police officer acting reasonably in the circumstances would have done to clarify the factual situation.'" *Id.* at 1228-29.

In *Kingsland*, the Eleventh Circuit held that, to establish a federal malicious prosecution claim under § 1983, a plaintiff must prove both the elements of the common law tort and "a

12

violation of her Fourth Amendment right to be free from unreasonable seizures." *Id.* at 1234.

According to *Kingsland,*

> Under Florida law, a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding. *Durkin v. Davis,* 814 So. 2d 1246, 1248 (Fla. Dist. Ct. App. 2002)(citing *Burns v. GCC Beverages, Inc.,* 502 So. 2d 1217 (Fla. 1986)). Only the fourth and fifth elements are at issue here: whether there was an absence of probable cause for the original criminal proceeding, and whether there was malice on the part of the defendants.
> "It is well settled that in an action to recover damages for malicious prosecution where, as here, the evidence is in dispute, the existence or non-existence of malice and want of probable cause are questions of fact for the jury." *Good Holding Co. v. Boswell,* 173 F.2d 395, 399 (5th Cir. 1949). Consequently, because Kingsland challenges the legitimacy of the relevant evidence, concerns regarding the fulfillment of the fourth and fifth elements for the common law tort of malicious prosecution are rightly reserved for the jury.

*Id.* at 1234-35.

Applied to the facts of this case, the law is clearly established that Atiles also violated the Fourth Amendment. In *Whiting v. Traylor,* 85 F.3d 581 (11th Cir. 1996), the Eleventh Circuit reasoned that a claim may be brought under 42 U.S.C. § 1983 "where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained in violation of the Fourth Amendment and injuries, due to the seizure, follow as the prosecution goes ahead." *Id.* at 584. The *Whiting* court reasoned that *Kelly v. Curtis,* 21 F.3d 1544, 1555 (11th Cir. 1994), recognized that a claim of malicious prosecution may, as long as it relies on the Fourth Amendment, be brought pursuant to 42 U.S.C. § 1983. *Id.* "Given *Albright* [*v. Oliver,* 510 U.S.

13

266 (1994)(plurality opinion)] and *Kelly* and - in particular - the language of the Fourth Amendment, we think referring to a federal 'right' to be free from malicious prosecution is actually a description of the right to be free from an unlawful seizure which is part of a prosecution." *Id.*

Atiles suggests the state judge's finding of probable cause precludes Thornton's claim. Yet, *Franks v. Delaware*, 438 U.S. 154 (1978), squarely rejects this argument, establishing that the Fourth Amendment provides a citizen the right to challenge the truthfulness of the factual statements made in an affidavit supporting the *ex parte* issuance of a search warrant. *See Martin, supra* (extending *Franks* to arrest warrants). Likewise, in *Malley v. Briggs*, 475 U.S. 335 (1986), the Supreme Court rejected an officer's claim that, because the magistrate issued the warrant at the officer's request, (thus finding probable cause), the officer is immune. *Id.* at 345. Even when a judge approves a request for a warrant, the *Malley* Court reasoned, the question remains

> whether a reasonably well-trained officer in [the same] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest.

*Id.* (rejecting argument that an officer who has no probable cause to request warrant is immunized by a magistrate who mistakenly issues a warrant nonetheless).

In *Garmon v. Lumpkin County*, 878 F.2d 1406 (11th Cir. 1989), the Eleventh Circuit similarly reasoned that in very similar circumstances, that is, the issuance of a warrant based on a very terse, conclusory affidavit, "Because the affidavit contained nothing but the investigator's conclusions that [plaintiff] had committed the crime, the magistrate would not possibly have conducted the independent assessment required by the fourth amendment of the probability that [plaintiff] committed the crime charged." *Id.* at 1409. The *Garmon* court reversed the district

court's order granting the defendant a directed verdict on the defense of qualified immunity. *Id.* at 1411.

In *Tillman v. Coley*, 886 F. 2d 317 (11th Cir. 1989), the Eleventh Circuit similarly reversed an order granting summary judgment on the basis of qualified immunity. *Id.* at 318. As in this case, the Fourth Amendment claim involved an unreasonable failure to confirm the identification of a suspect before making an arrest.

In *Tillman*, which also involved an undercover drug purchase, on October 19, 1985 a police officer bought narcotics from a young woman who identified herself as "Mary Tillman." *Id.* The officer's report provided a description that included clothing, complexion, height and weight, and age, 24 years. *Id.* The undercover officer provided his report to the defendant sheriff. *Id.* He knew a "Mary Tillman" who lived a few hundred yards from the transaction, but he knew that this Mary Tillman was 41, not 24 years old. *Id.* The defendant took no steps between October 19, 1995 and January 10, 1986 to determine whether the women were one and the same. *Id.* On the latter date, the defendant typed an affidavit for the undercover officer to sign to obtain an arrest warrant for the "Mary Tillman" known to the defendant, despite the doubt created by the age difference. *Id.* A magistrate issued the warrant with no knowledge of the defendant's awareness of an age difference. *Id.*

The plaintiff was arrested on the warrant seven days later. *Id.* Upon her arrival at the jail, the undercover officer was called to identify her, and he immediately reported that she was not the suspect, and she was released. *Id.*

On appeal, the *Tillman* court ruled that the defendant sheriff was not entitled to qualified immunity. *Id.* at 320. The Eleventh Circuit found that a reasonably well-trained officer would have known that probable cause did not exist. *Id.* The court rejected the argument that probable cause existed without the need for further investigation into the age discrepancy, and that an

15

arrest could be made for the purpose of confirming the identity of the suspect. *Id.*

The Eleventh Circuit concluded that time was not of the essence in making the arrest, noting the three month gap between the transaction and the arrest. *Id.* According to the court, while the law does not require that law enforcement officers take every conceivable investigatory step, "due process does require that some steps be taken to eliminate doubts concerning identity that exist prior to obtaining the warrant and to arrest." *Id.* at 321. As the court reasoned,

> A reasonable police officer would have been sufficiently concerned by the age discrepancy of a generation to make further investigation as to whether the Mary Tillman he knew had a daughter or a niece. At the very least, Coley could have inquired of the undercover police officer whether the seller could have been closer to forty years of age. In light of the age discrepancy, Sheriff Coley could not rely solely on his own or a fellow police officer's belief that the name was correct, or that only one Mary Tillman lived or visited in the area. In addition, the undercover police officer could have identified Mary Tillman as the suspect in a "stake-out" of her home, or her work, or through another purchase.

*Id.*

Under the record facts of this case, and applying the above Supreme Court and Eleventh Circuit law, Atiles is not entitled to summary judgment on Thornton's Fourth Amendment claim. It is undisputed that Atiles misidentified Thornton. It is also undisputed that a fellow officer, Officer Neal, provided Atiles with a name, Desmond Thornton, and a photograph of Desmond Thornton. It is undisputed that Atiles viewed the photograph, and based on that photograph "identified" the man who appeared next to her vehicle and handed her crack cocaine in exchange for $20.00 as Thornton.

Obviously, no reasonable officer could have concluded that the photograph of Desmond Thornton provided to Atiles depicted the suspect. Comparing Thornton's December 22, 2004 booking photograph with the videotape image, no reasonable officer could conclude that plaintiff appeared in the videotape. As in *Tillman*, time was not of the essence in this case. The

videotape captured events occurring on June 5, 2004, but Atiles did not complete her probable cause affidavit until July 22, 2004. During that lengthy period, any reasonable officer would simply have confirmed, by comparing the videotape image with any readily available image of Thornton, that Thornton was not the suspect. More important, no reasonable officer could have viewed a photograph of Desmond Thornton on June 5, 2004 and concluded that he was the young man who was videotaped handing cocaine through Atiles' open window earlier that day.

C.   *The False Arrest Claim Against the City of Tampa*

The City's defense to Thornton's false arrest claim is a technical one. The City contends that, because Atiles did not arrest Thornton on her probable cause affidavit, Thornton's claim is not one for false arrest. Instead, the City argues, because Atiles' affidavit was submitted to a judge, who then signed a warrant, Thornton's state law claim is actually a malicious prosecution claim for which Atiles, but not the City, should be liable.

It is clear that the warrant issued in this case was purely ministerial, as opposed to the product of an independent assessment of probable cause by a judicial officer. Indeed, in this regard this case is remarkably similar to *Garmon*. The judge issuing the warrant had no basis to establish probable cause other than by virtue of Atiles' affidavit. This affidavit, by itself, authorized a warrantless arrest. Moreover, Atiles testified that, once she signed the probable cause affidavit, she was not aware that it was submitted to a judge with a request for a warrant.

Because Thornton could have been arrested based on Atiles' probable cause affidavit alone, the fact that a judge issued a warrant, based on nothing more than Atiles' affidavit, does not transform a state law false arrest claim into a state law malicious prosecution claim. The judge's ministerial act was without any independent legal significance. Accordingly, the city's

motion for summary judgment should be denied as well.

WHEREFORE, the motions for summary judgment filed by defendants Atiles and the City of Tampa should be denied.

Respectfully submitted,

FARMER AND FITZGERALD, P.A.

/s MATTHEW P. FARMER, ESQ.
Matthew P. Farmer, Esq.
Fla. Bar No. 0793469
708 E. Jackson St.
Tampa, Florida 33602
(813) 228-0095
FAX (813) 224-0269
MattFarmer1@aol.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic mail on the 18th day of December, 2009 to the following:

Ursula Richardson, Esq.
ursula.richardson@ci.tampa.fl.us


/s MATTHEW FARMER, ESQ.
COUNSEL